RUBIN LLC
Paul A. Rubin
Hanh V. Huynh
11 Broadway, Suite 715
New York, New York 10004
Tel: 212.390.8054
Fax: 212.390.8064
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

*Counsel for GLL BVK Columbus Circle LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | : | |
|---|---|---|
| In re: | : | Sub-Chapter V Chapter 11 |
| | : | |
| ZHANG MEDICAL P.C., d/b/a NEW HOPE FERTILITY CENTER, | : | Case No.: 23-10678-pb |
| | : | |
| | : | |
| Debtor. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**LANDLORD'S OBJECTION TO DEBTOR'S MOTION FOR THE ENTRY OF
AN ORDER AUTHORIZING THE DEBTOR TO REJECT ITS COMMERCIAL
LEASE WITH GLL BVK COLUMBUS CIRCLE LLC AS OF JUNE 30, 2023**

GLL BVK Columbus Circle LLC (the "Landlord"), by its undersigned counsel, submits this objection (the "Objection") to the motion (the "Motion") [ECF No. 74] filed by Zhang Medical P.C. d/b/a New Hope Fertility Center (the "Debtor") for entry of an order, pursuant to sections 105(a) and 365(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 6006-1, authorizing the Debtor to reject its lease with the Landlord, *nunc pro tunc* to June 30, 2023. In support of this Objection, the Landlord respectfully represents as follows:

## PRELIMINARY STATEMENT[1]

1. The Debtor's request for *nunc pro tunc* relief, making the effective date of the rejection of the Lease retroactive to June 30, 2023, has no support in the case law and should be denied. Although the Landlord does not seek to substitute the Debtor's business judgment with respect to the proposed rejection of the Lease, the Debtor has not satisfied its burden to demonstrate that retroactive relief is appropriate or warranted in this case. The Debtor has not cited a single case that permitted retroactive rejection of a lease when the debtor continued to occupy and operate its business from the leased premises, whereas here the Debtor continues to occupy and operate its business from the Leased Premises.

2. The Landlord further submits that, if the Court were to authorize rejection of the Lease, the Court should order the Debtor to timely pay at the beginning of each month for its anticipated continued use and occupancy of the Leased Premises at the rate provided in the Lease, which is the presumptive value of a debtor's post-rejection use and occupancy of leased premises under Second Circuit law.

## BACKGROUND

3. The Landlord is the owner of real property located at 4 Columbus Circle, New York, New York (the "Building"). The Landlord leases to the Debtor the entire second, third, fourth and fifth floors (the "Leased Premises") in the Building pursuant to that certain Agreement of Lease dated December 31, 2018 (together with all amendments, the "Lease").[2]

4. The Debtor has asserted that it conducts its business from the third and fourth floors, but the second floor contains only a small lab that occupies less than 1,000 square feet and the fifth

---

[1] Capitalized terms not defined in the Preliminary Statement have the meaning ascribed to them in this Objection.

[2] The Lease, together with other Lease-related documents referenced herein are annexed as exhibits to the Declaration of Alin T. Sigheartau in support of the Landlord's Section 365(d)(3) Motion (defined below) [ECF No. 25].

floor is vacant, save for some construction materials. The Declaration of Frank Mollo, an employee of the Landlord's property manager, filed contemporaneously herewith in support of the Objection, provides a more complete and accurate description of the status of the second and fifth floors.

5. As set forth in the Mollo Declaration and evidenced in the photographs annexed as Exhibit A thereto, there is much more than just a lab on the second floor. The second floor also contains a large medical imaging room, with an adjoining waiting area; a conference room with another adjoining waiting/seating area; an area for a grand piano; a storage room; and an area for the desk of the Debtor's own mechanic/handyman. *See* Mollo Decl. ¶ 5. Additionally, Mr. Mollo has been informed by security guards who work at the Building that the second floor has, on occasion, been used for social purposes after business hours, with music and other indicia of a social gathering. *Id.* (The Landlord does not concede that this is a permitted use of the Leased Premises.)

6. As set forth in the Mollo Declaration and evidenced in the photographs annexed as Exhibit B thereto, the fifth floor is in the middle of construction begun by the Debtor pursuant to its own plans. Mollo Decl. ¶ 6. There is construction material and debris throughout the floor. *Id.* The plumbing is shut off on the fifth floor because of a leak that the Debtor has not resolved. *Id.* The build-out being conducted on the fifth floor is specialized and is tenant-specific for medical practice use. *Id.* Accordingly, the specialized nature of the (unfinished) build-out severely narrows the field of potential tenants that would consider leasing that space.

7. Following the Debtor's defaults under the Lease beginning in or about July 2020, on or about March 10, 2021, the Landlord commenced an action in the Supreme Court of the State of New York, County of New York (the "State Court"), asserting claims against the Debtor for

failure to pay rent, failure to provide a security deposit, failure to discharge a lien filed on the Building, and for improperly subletting and/or permitting others to use the Leased Premises. The Debtor and the Landlord were able to negotiate a consensual resolution of the 2021 State Court action, as memorialized in that certain Second Amendment of Lease dated December 31, 2021.

8. Beginning in October 2022, however, the Debtor again defaulted under the terms of the Lease by, among other things, failing to pay rent, failing to make certain payments to replenish the security deposit, and allowing a new mechanic's lien to be filed against the Building in the amount of over $1.3 million for unpaid construction work on the Leased Premises. As of April 13, 2023, the Debtor was in arrears on its fixed rent and additional rent obligations under the Lease in the total amount of $3,046,893.04 and was in default on its obligation to replenish the security deposit in the amount of $2,458,665.00.

9. As a result of the Debtor's numerous defaults under the Lease, on April 18, 2023, the Landlord commenced a new action in the State Court for, among other things, the Debtor's breach of the Lease.

10. On April 30, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor elected to proceed under Subchapter V of chapter 11. The Landlord is by far the debtor's largest creditor, and the Debtor has acknowledged that the Debtor's chapter 11 filing was precipitated by the Landlord's commencement of the State Court action in April 2023.

11. Since the Petition Date, the Debtor has allowed two more mechanic's liens to be filed against the Building, as far as the Landlord knows. Thus, as of the date hereof, there are three mechanic's liens filed against the Building of which the Landlord is aware in the total amount of $1,395,034.40.

12. For the period following the Petition Date, from May 1, 2023 going forward, the monthly fixed rent due under the Lease is $409,777.50 (the "Post-Petition Monthly Fixed Rent"). In addition, the Debtor is obligated to pay additional rent charges, including but not limited to, charges for electricity, HVAC, condenser water, water, real estate taxes and miscellaneous maintenance costs (collectively, the "Additional Rent Lease Obligations") as those expenses become due. Following the Petition Date, bankruptcy counsel for the Landlord contacted Debtor's counsel to request payment of the Post-Petition Monthly Fixed Rent for May 2023. When the Debtor failed to make payment, the Landlord filed a motion (the "Section 365(d)(3) Motion") [ECF No. 24] to compel the payment of May and June 2023 Post-Petition Monthly Fixed Rent and thereafter the timely payment thereafter of all Post-Petition Monthly Fixed Rent and Additional Rent Lease Obligations as they became due pursuant to the terms of the Lease.

13. Following a hearing on June 6, 2023, the Court granted the Landlord's Section 365(d)(3) Motion and entered an order (the "Section 365(d)(3) Order") [ECF No. 51], *inter alia¸* requiring the Debtor to pay the May and June 2023 Post-Petition Monthly Fixed Rent within three days of entry of the order, and to timely pay all subsequent Post-Petition Monthly Fixed Rent and Additional Rent Lease Obligations as they became due. The Debtor has paid the May, June and July 2023 Post-Petition Monthly Fixed Rent and Additional Rent Lease Obligations pursuant to the Section 365(d)(3) Order.

14. On June 30, 2023, the Debtor filed the Motion, seeking authorization to reject the Lease. Notwithstanding that July 2023 Post-Petition Monthly Fixed Rent and Additional Rent Lease Obligations would be required to be timely paid pursuant to the Section 365(d)(3) Order, and even though payment for July 2023 Post-Petition Monthly Fixed Rent and Additional Rent

Lease Obligations has been received, the Debtor seeks retroactive relief effective as of June 30, 2023.

## ARGUMENT

15. The Debtor's request for retroactive relief in its Motion should be denied because (i) such relief is incompatible with the Court's Section 365(d)(3) Order, and (ii) the circumstances in this case do not justify *nunc pro tunc* relief.

16. First, the Section 365(d)(3) Order precludes the type of *nunc pro tunc* relief being requested by the Debtor. Under the express, unambiguous terms of the Section 365(d)(3) Order, the Debtor must timely pay the Post-Petition Monthly Fixed Rent and Additional Rent Lease Obligations as they become due pursuant to the Lease. The July 2023 Post-Petition Monthly Fixed Rent and Additional Rent Lease Obligations came due and owing on July 1, 2023, and have been paid. Permitting the Lease to be rejected *nunc pro tunc* to June 30, 2023 (when the Debtor's obligation to pay the July invoices has already accrued) would contradict the terms of the Section 365(d)(3) Order. Moreover, there is no provision in the Section 365(d)(3) Order that provides for the claw-back of amounts paid pursuant to the order, or that amounts paid pursuant to the order can be credited against future obligations of the Debtor to the Landlord. To the extent that the Debtor makes such a request, the Landlord objects and submits that there is no basis to modify the Section 365(d)(3) Order to provide for such relief.

17. Second, although the Debtor argues that the Court *may*, in its discretion, set a retroactive effective date for the rejection of the Lease, the Debtor has not demonstrated that the Court *should* do so in this case. In fact, the factual circumstances in the cases cited by the Debtor in its Motion support the denial of *nunc pro tunc* relief. No cases cited by the Debtor involved the situation here, where the Debtor is still occupying and operating its business from the Leased Premises and has provided no indication when it is going to vacate. To the contrary, every single

case cited by the Debtor in support of its request for *nunc pro tunc* relief involved debtors that had already vacated the leased premises. *See* Motion ¶ 14, which cites the following cases: *Adelphia v. Abnos*, 482 F.3d 602 (2d Cir. 2007) (debtor had vacated premises and requested *nunc pro tunc* relief as of date it vacated); *BP Energy v. Bethlehem Steel*, 2002 WL 31548723 (S.D.N.Y. Nov. 15, 2002) (debtor expressly instructed counterparty to executory contract for sale of gas to stop providing services under the contract and sought rejection retroactive to date of notification to terminate services); *In re Jamesway Corp.*, 179 B.R. 33 (S.D.N.Y. 1995) (where debtor had vacated and was already conducting going out of business sales for five months, court made rejection order retroactive to the date that the court could have entered the order but for the landlord's objection); *In re Buyk*, Case No. 22-10328 (Bankr. S.D.N.Y. May 25, 2022) [ECF No. 226] (per paragraph 37 of the underlying motion, at ECF 37, premises for leases being rejected *nunc pro tunc* were never occupied and the debtor never conducted any business from those locations); *In re GBG USA Inc.* Case No. 21-11369 (Bankr. S.D.N.Y. Sep. 1, 2021) [ECF No. 151] (per paragraphs 4-5 of the underlying motion, at ECF 18, premises for leases being rejected *nunc pro tunc* were already vacated, notices of surrender delivered, and keys returned prior to the requested *nunc pro tunc* date); *In re Skill Capital*, Case No. 21-11275 (Bankr. S.D.N.Y. Aug. 10, 2021) [ECF No. 33] (per paragraph 8 of the underlying motion, at ECF 2, premises for lease being rejected *nunc pro tunc* had been vacated a month earlier than the requested *nunc pro tunc* rejection date and the keys had been turned over to the landlord prior to the requested *nunc pro tunc* date; *In re Solstice Marketing Concepts*, Case No. 21-10306 (Bankr. S.D.N.Y. Mar. 18, 2021) [ECF No. 96] (per paragraph 4 of the underlying motion, at ECF 12, premises for leases being rejected *nunc pro tunc* had already been surrendered, vacated, and left in broom clean condition prior to the requested *nunc pro tunc* date); *In re KB US Holdings*, Case No. 20-22962 (Bankr. S.D.N.Y. Nov.

12, 2020) [ECF 355] (per paragraph 8 of the underlying motion, at ECF 282, premises for two leases being rejected *nunc pro tunc* were already vacated, the inventory removed from those locations, and operations there had ceased prior to the requested *nunc pro tunc* date); *see also In re Thinking Machines Corp.*, 67 F.3d 1021 (1st Cir. 1995) (cited by Debtor, but case does not support Debtor's position that rejection should be as of date Motion was filed, because court there held that court approval of the rejection is condition precedent to rejection).

18. As the numerous cases cited by the Debtor itself clearly illustrate, *nunc pro tunc* relief is not appropriate in this case where the Debtor continues to occupy and operate its business from the Leased Premises. The Landlord submits that, if the Court were to enter an order authorizing the rejection of the Lease, the effective date of the Lease rejection should be the date any such order is entered.

19. Moreover, the Debtor gives no indication in its Motion of the length of time that the Debtor intends to remain at and operate its business from the Leased Premises post-rejection. In its prior filings, the Debtor has alluded to the complexity of its business and the challenges in relocating its operations, a process that the Debtor previously asserted could take at least six months to complete. *See, e.g.,* the Debtor's objection to the Section 365(d)(3) Motion [ECF No. 36] at ¶ 5 ("Unlike most businesses before the Court, the Debtor can not simply close its doors and relocate. It stores over 40,000 human embryos, sperm and eggs and is subject to extensive regulation and oversight by, among other entities, the Food and Drug Administration. Its labs and some equipment are climate-controlled and must be maintained under a sophisticated air filtration system."); the declaration of Dr. Zhang in support of the Debtor's objection to the Section 365(d)(3) Motion [ECF No. 36] ¶ 8 ("Relocating the embryos and gametes would be a time-consuming and costly process. I believe that process will take at least 6 months to accomplish.").

20. If the Court were to authorize the rejection of the Lease, the Debtor should continue to pay the fixed monthly rent and the additional rent obligations as provided in the Lease for so long as the Debtor has possession of the Leased Premises. The rate provided for in the Lease is the presumptive amount for the Debtor's post-rejection use and occupancy of the Leased Premises. *See Farber v. Wards Co., Inc.*, 825 F.2d 684 (2d Cir. 1987) ("Where … a Chapter 11 debtor occupies property under a rejected lease, the debtor is liable only for the reasonable value of its use and occupancy of the property. Absent contrary evidence, the prior lease rate is ordinarily presumed to be the proper measure of value.") (citations omitted). In this case, the Debtor has not submitted any contrary evidence of *comparable* space available for the Debtor's operations or the rent reserved or sought for any such *comparable* space. Particularly given the Debtor's acknowledgment of the specialized needs for its particular business and the difficulties of a relocation to a suitable alternative space, the Debtor must provide evidence of the availability and the total cost (including, but not limited to, the cost of any required build-out, security obligations, guarantee obligations, escalations, etc.) for comparable premises. All the Debtor has provided is hearsay testimony that there are spaces available for cheaper rent. That is not sufficient to overcome the presumption that the Lease rates should apply to the Debtor's post-rejection use and occupancy of the Leased Premises.

21. Lastly, the Landlord finds it noteworthy that the Debtor appeals to the equities in this case, and the need for *nunc pro tunc* relief because the Debtor claims that the summer months of July and August are historically slower. The Debtor argues that payment of its rental obligations under the Lease for July would allegedly strain the Debtor's cashflow. But nowhere does the Debtor consider any belt-tightening measures the Debtor could have taken in anticipation of the coming alleged seasonal slow-down (which the Debtor presumably has known about even before

it filed this chapter 11 case), including any reduction in compensation and employment perks for the Debtor's sole principal, Dr. Zhang.

WHEREFORE, for all the reasons set forth herein, the Landlord respectfully requests that the Court deny the Motion, and if the Court were to enter an order authorizing rejection of the Lease, that order provide that the Debtor must timely pay at the beginning of each month the Post-Petition Monthly Fixed Rent and Additional Rent Lease Obligations pursuant to the Lease for its continued use and occupancy of the Leased Premises, and grant the Landlord such other and further relief as the Court deems just and proper.

Dated: New York, New York
July 13, 2023

                                                RUBIN LLC

                                                By:    */s/ Paul A. Rubin*
                                                        Paul A. Rubin
                                                        Hanh V. Huynh
                                              11 Broadway, Suite 715
                                              New York, New York 10004
                                              Tel: 212.390.8054
                                              Fax: 212.390.8064
                                              prubin@rubinlawllc.com
                                              hhuynh@rubinlawllc.com

                                              *Counsel for GLL BVK Columbus Circle LLC*